UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

---

*In re*:                                                                Case Number: 20-11642-12

    KEVIN R. SPINDLER
    and BETH A. SPINDLER,

        Debtors.

---

## **MEMORANDUM DECISION**

Kevin and Beth Spindler ("Debtors") filed a Chapter 12 petition. Debtors filed a Chapter 12 Plan.[1] The Plan proposed re-amortization of the mortgage debt on the Debtors' homestead with payments made directly to Farm Service Agency.

The Trustee objected to the Plan.[2] Debtors then filed an amended plan ("Amended Plan").[3] It contains these provisions relating to the debt owed to Farm Service Agency ("FSA") on their homestead real estate**:**

> Farm Service Agency has a secured claim in the amount of $444,864.22 that is secured by a mortgage on the real estate and a UCC Financing Statement on the farm personal property. All terms and provisions of the mortgage and promissory note remain in effect, except as modified herein.
>
> 1)    Farm Service Agency holds a valid real estate mortgage and a 1st lien on the Debtors' real estate with a claim in the amount of $392,210.82. The claim shall be amortized over thirty (30) years at 2.375% interest for a monthly payment of $1,524.34. The first payment shall be due 30 days after the Court enters an Order confirming the chapter 12 plan and the same day each subsequent month until paid in full. The Debtors shall

---

[1] ECF No. 26.
[2] ECF No. 29.
[3] ECF No. 38.

pay real estate taxes and insurance directly as they come due. The payment shall continue after the chapter 12 plan is completed. Farm Service Agency retains its mortgage on the real estate until paid in full.

**Paid Direct** - Monthly Payment of $1,524.34

The Amended Plan also includes a provision for continued current direct payments on a student loan. With that added exception and the FSA mortgage, all payments under the Amended Plan are to be paid through the Trustee. The Trustee does not object to payment of the student loan payments directly to the creditor.

Although other parties in interest previously objected, the Amended Plan resolved all objections other than that of the Trustee. At the continued hearing, the Trustee confirmed there were remaining issues with the Plan, including the Trustee's belief that the re-amortized FSA debt should be paid through the Trustee's office. Trustee asserts that:

> The debtor is proposing a new amortization and direct payment on the debt owed to Farm Service Agency, secured by the debtors' real estate. Since the re-amortization is occurring within the context of the Chapter 12, the proposed payments should be paid through the Trustee's office for the duration of the Plan.[4]

The Court issued a preliminary oral decision on the question of direct payments but reserved the right to reduce such decision to writing.

---

[4] ECF No. 29 ¶ 4.

2

**JURISDICTIONAL STATEMENT**

This is a core proceeding under 28 U.S.C. § 157(b)(1), (b)(2)(A), and (b)(2)(L). This court has jurisdiction to hear and decide this matter pursuant to 28 U.S.C. § 1334(a).

**DISCUSSION**

The Amended Plan and the Trustee's objection place before the Court a question of policy versus statutory interpretation. May a Chapter 12 debtor make direct payments to an impaired creditor or one whose claim is modified by a plan? This permits a debtor to avoid making those payments through the trustee while preventing a trustee from collecting fees on those payments.

Chapter 12 was created as a response to a downturn in the farm economy during the 1980s and its ripple effect in the agricultural and related industries. Pub. L. No. 99-554, Title II, 100 Stat. 3110. Chapter 13 bankruptcy was not seen as viable for family famers. The debt ceiling for eligibility was too low; the restrictions on reorganizing residential real estate debt did not allow for the restructuring of typical family farm mortgage debt; and, because payments had to all be scheduled during the short plan term, a long-term workout was impossible. Similarly, Chapter 11 was ill-suited to a family farm operation. While Chapter 11 provides a good forum for debtors with more complex financial difficulties, it is costly, cumbersome, and overwhelming for an unsophisticated small business. Moreover, the "absolute priority rule" prohibited Chapter 11 debtors from retaining an equity interest in their farm

over the objections of a dissenting class of unsecured creditors. This made Chapter 11 unworkable for most farmers.

The objective of Chapter 12 is to facilitate plan confirmation without the other complications of a Chapter 11 and not subject to the debt limitations of a Chapter 13. In other words, simplification of the process. Chapter 12 was modeled on Chapter 13, but it is not a Chapter 13.

Congress recognized the difficulties for farmers complying with either Chapter 11 or Chapter 13 and thus blended concepts from both. The submission and confirmation of a plan in Chapter 12 differs from the provisions of Chapters 11 and 13. This confirms the intention of Congress to differentiate among the chapters to address the different needs of various debtors. One area of similarity between Chapter 13 and Chapter 12, however, is the provision for a standing trustee. 28 U.S.C. §§ 1202(a), 1302(a).

11 U.S.C. § 1225(a)(5)(B)(ii) of the Code, about plan confirmation, provides that:

> with respect to each allowed secured claim provided for by the plan . . . the value, as of the effective date of the plan, of property to be distributed *by the trustee or the debtor* under the plan on account of such claim is not less than the allowed amount of such claim . . . .

Thus, by its plain language, the Code allows for payments to creditors by either the debtor or the trustee. Additionally, section 1226(c) states that the trustee shall make distributions to creditors, "[e]xcept as otherwise provided in the plan." And section 1222(a)(1) directs the debtor to submit "all or such portion of future earnings or other future income . . . to . . . the trustee *as is necessary for the execution of the plan.*" (Emphasis added.) Read together, these sections

4

imply that *if* the plan provides otherwise, the trustee *will not* be making payments to creditors under the plan, thereby contemplating direct payments by debtors.

There is no statutory rule outlining when direct payments are permitted. Whether direct payments are permitted percolated through the courts in the 1980s and 1990s. As a downturn in the economy once again is affecting farmers, the question is reemerging.

There is no Seventh Circuit case addressing the issue in a Chapter 12. Neither has the question been decided by the Supreme Court.

The courts that have wrestled with the issue are split. There are three approaches: (1) debtors cannot make direct payments to impaired creditors; (2) debtors can pay secured creditors directly regardless of impairment; or (3) whether direct payments should be allowed must be determined case-by-case. The majority approach is the case-by-case analysis.

The first approach is straightforward and self-explanatory. It interprets the Code as prohibiting direct payments. *Fulkrod v. Savage (In re Fulkrod)*, 973 F.2d 801 (9th Cir. 1992); and *In re Marriott*, 161 B.R. 816 (Bankr. S.D. Ill. 1993). Under *Fulkrod*, all payments on impaired or modified claims must be paid through the trustee. The language in *Fulkrod* has been interpreted as merely "recogniz[ing] that the debtor may, as a disbursing agent, sign checks and make cash payments." *Id.* at 803.

The second approach is also straightforward and self-explanatory. It is a blanket rule allowing debtors to pay secured creditors directly, regardless of

their impaired status. *Wagner v. Armstrong (In re Wagner)*, 36 F.3d 723 (8th Cir. 1994); and *In re Crum*, 85 B.R. 878 (Bankr. N.D. Fla. 1988).

The third approach is the one adopted by most courts. It permits direct payments in some cases. Courts that follow this approach begin with the factors from *In re Pianowski*, 92 B.R. 225 (Bankr. W.D. Mich. 1988). The *Pianowski* factors are:

1. the past history of the debtor;

2. the business acumen of the debtor;

3. the debtor's post-filing compliance with statutory and court-imposed duties;

4. the good faith of the debtor;

5. the ability of the debtor to achieve meaningful reorganization absent direct payments;

6. the plan treatment of each creditor to which a direct payment is proposed to be made;

7. the consent, or lack thereof, by the affected creditor to the proposed plan treatment;

8. the legal sophistication, incentive and ability of the affected creditor to monitor compliance;

9. the ability of the trustee and the court to monitor future direct payments;

10. the potential burden on the Chapter 12 trustee;

11. the possible effect on the trustee's salary or funding of the U.S. Trustee system;

12. the potential for abuse of the bankruptcy system;

13. the existence of other unique or special circumstances.

Courts that have followed this approach include some or all of those factors. *In re Martens*, 98 B.R. 530 (Bankr. D. Colo. 1989); *In re Seamons*, 131 B.R. 459 (Bankr. D. Idaho 1991); *In re Golden*, 131 B.R. 201 (Bankr. N.D. Fla. 1991); *Westpfahl v. Clark (In re Westpfahl)*, 168 B.R. 337 (Bankr. C.D. Ill. 1994); *In re Speir*, No. 16-11947-JDW, 2018 WL 3814276 (Bankr. N.D. Miss. Aug. 8, 2018).

Although not in a Chapter 12 context, the Seventh Circuit in *In re Aberegg*, 961 F.2d 1307 (7th Cir. 1992), found that Chapter 13 debtors could make direct payments to creditors in some cases. It has been cited by many courts wrestling with the issue. *Aberegg* took a pragmatic approach to direct payment of mortgages. Since the plan provided for mortgage payments to extend beyond the life of the plan, the court found it counterproductive to require the debtors to make payments to the trustee during the plan term and then arrange for direct payments thereafter.

The cases using the third approach may appear, facially, to create confusion because of the varied means used to permit direct payment in some cases. Simplified, the cases conclude: 1) there is not an absolute right to make direct payments; 2) the Code leaves open the possibility of direct payments to creditors; 3) debtors can make direct payments in some situations; and 4) the Code does not prohibit plan provisions allowing direct payments.

The claim here is the mortgage debt to FSA. It modifies the terms of the mortgage by re-amortizing the debt. Payments will continue well beyond the term of the Amended Plan. FSA has consented to its treatment. The Trustee argues that, while direct current payments for claims not modified by a plan on

7

a homestead mortgage are permitted, if the payments are restructured then payments must be made through the Trustee.

The Chapter 12 Trustee has a crucial role in the reorganization process. His or her responsibilities begin when the case is filed and continue until it is closed. Along with the duties outlined in 11 U.S.C. § 1202, cross-referencing 11 U.S.C. §§ 704 and 1106, the Trustees are a source of information, education, and mediation. Often the Trustee can be the difference between success and failure in Chapter 12 cases.

These responsibilities are important. This Court's perspective is driven by long experience with the office of the Chapter 12 Trustee. Experience provides a unique perspective on and appreciation for the vital role the Chapter 12 Trustee plays. The perspective, however, does not override the language of the statutes that property is to be distributed by *the trustee or the debtor* and the exception created by section 1226(c). The question, then, is when will direct payments be permitted.

This Court adopts the majority approach. Determination of whether payments will be direct or through the Trustee should be made case-by-case. *Pianowski,* 92 B.R. at 233. The *Pianowski* factors are not binding but instructive. It is within the discretion of the Court to consider and weigh the factors in each case or even for different claims in the same case.

Debtors have shown a sincere desire to reorganize and to adjust their relationships with creditors. Negotiations with FSA resolved objections to the initial plan and led to the Amended Plan before the Court. These factors,

including the consent of FSA to the modified plan terms, favor direct payments to FSA on the mortgage.

To date it appears the Debtors have complied with Court orders. But the Debtors have not provided the three-year cash flow projection, liquidation analysis, and first quarterly report. This weighs somewhat in favor or the Trustee's position. The Debtors have promised that compliance with these requirements will be forthcoming. Because the Amended Plan has not been confirmed and another hearing is scheduled, there is still an opportunity for the Debtors to bring these deficiencies into compliance.

Except for the payments to FSA on the homestead and a student loan, all payments to other creditors will go through the Trustee. FSA is a sophisticated creditor. It can monitor the payments. FSA can enforce Debtors' adherence to the Amended Plan. *Pianowski*, 92 B.R. at 233-34. The same is true for the student loan. So too is the Trustee able to monitor payments. The Debtors will need to continue to file operating reports. Direct payments must be reflected in those reports. Direct payments on the mortgage will not place an inordinate burden on the Trustee to monitor direct payments that can easily be determined from the operating reports.

And direct payment of the mortgage will avoid about $5,000 in trustee fees or about $138 per month.[5] As noted, no cash flow projections have yet been filed, so it is impossible to judge feasibility right now. Based on Schedules

---

[5] The direct payments to FSA are $1,524.34 per month. The term of the Amended Plan is 36 months. At a trustee fee of 9%, this would generate more trustee fees of $4,938.00 over the life of the plan if payments were made through the trustee.

9

I and J, the total payments under the Amended Plan are about 102% of the Debtors' net monthly income when the case was filed. The addition of even $130 per month may further lessen the opportunity of the Debtors to reorganize. A conclusion in this regard will await further filings and information, but overall this factor favors the Debtors.

The potential for abuse is a factor to be considered. This focuses on the possibility of preferential treatment for some creditors or the inability of some creditors to cost effectively monitor payments. Neither of these apply to FSA. It would make little sense to require Debtors to disburse their mortgage payments through the Trustee for three years only to have to arrange direct payments at the end of the plan. *In re Aberegg*, 961 F.2d at 1310.

The Amended Plan does provide for certain payments to FSA to be made through the Trustee for the term of the plan and then directly afterward. Those payments are for what has been called debt for personal property. Debtor owes FSA on a series of six notes. The notes are cross-collateralized by the real estate and virtually all of Debtors' assets. Annual payments on each note were scheduled. Neither the schedules nor the FSA claim says whether there was a pre-petition default on the real estate related notes or, if so, the amount of default to be cured. Based on the last payment dates, it is likely at least some of the payments on a portion of the notes were past due. Rather than provide for current equipment-related payments and cure of arrearages through the plan, the Amended Plan strikes a balance. It amortizes the portion of the total FSA claim secured by real estate into one direct payment and the balance of

the FSA claim (secured by non-real estate property) to be paid through the Trustee.

## CONCLUSION

The starting point must be the language of the Code itself. It sets forth the parameters of a permissible Chapter 12 Plan. The language permits the possibility of direct payments by the Debtors. The ability to make such payments is not unfettered. It is subject to confirmation of a plan containing such provisions by the Court. In that context, the Court uses its discretion in deciding whether to permit direct payments. The discretion is guided by how to weigh and apply the various factors based on the facts of each case.

Based on the facts and circumstances in this case, the factors support the Debtors paying the mortgage payment to FSA and the student loan directly and all other payments through the Trustee. For these reasons, the Trustee's objection is overruled.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

A separate order consistent with this decision will be entered.

Dated: December 28, 2020

BY THE COURT:

_____
Hon. Catherine J. Furay
U.S. Bankruptcy Judge